IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST Charles GLYNN, Attorney at Law.

BOARD OF ATTORNEYS PROFESSIONAL RESPONSIBILITY, Complainant-Respondent-Cross-Appellant,

v.

Charles GLYNN, Respondent-Appellant-Cross-Respondent.

Supreme Court

*No. 97–3058–D. Submitted on briefs December 3, 1998.—Decided April 27, 1999.*

(Also reported in 591 N.W.2d 606.)

202

For the respondent-appellant-cross respondent the cause was submitted on the briefs of *David J. Cannon* and *Michael Best & Friedrich, LLP,* Milwaukee.

For the complainant-respondent-cross appellant the cause was submitted on the briefs of *Robert G. Krohn* and *Roethe, Krohn, Pope & McCarthy, LLP,* Edgerton.

¶ 1. PER CURIAM. Attorney Charles Glynn appealed from the referee's conclusion that he engaged in dishonest conduct when he paid himself excessive and unauthorized fees in two guardianship matters and attempted to justify those payments by false itemized statements and by documents falsely indicating that he was reimbursing the estates for disbursements he had made to himself without court approval. He did not contest the referee's conclusions that he charged unreasonable fees and failed to provide competent representation and act with reasonable diligence and promptness in each of those matters. Attorney Glynn also appealed from the referee's recommendation that his license to practice law be suspended for six months as discipline for his professional misconduct. The Board of Attorneys Professional Responsibility (Board) cross-appealed from the referee's recommendation of discipline, arguing that the seriousness of the misconduct warrants a one-year license suspension.

¶ 2. We determine that the referee properly concluded that Attorney Glynn engaged in dishonest

conduct in the guardianship matters and that a one-year suspension of his license to practice law is the appropriate discipline to impose for the totality of his misconduct. By collecting unreasonable fees from three clients without the approval of the court in which their matters resided, by failing to file the necessary reports with the court in those matters and act competently and timely in them, and by using false statements and documents to justify his excessive fees and to mislead the person investigating his conduct, Attorney Glynn has demonstrated a willingness to place his own pecuniary interests above the interests of the clients whose representation he undertook by court appointment and to create false documents to prevent that conduct from being discovered.

¶ 3.    Attorney Glynn was admitted to the practice of law in Wisconsin in 1991 and practices in Milwaukee. He has not been the subject of a prior disciplinary proceeding. Pursuant to a stipulation of the parties and evidence presented at a disciplinary hearing, the referee, Attorney Michael Ash, made findings of fact concerning Attorney Glynn's conduct as guardian of two estates and as conservator of a third.

¶ 4.    Shortly after being admitted to the bar in 1991, Attorney Glynn began receiving appointments as guardian ad litem from the Milwaukee county probate court. Except for the three matters considered in this proceeding, none of his appointments involved the handling of other persons' funds.

¶ 5.    In the first matter, Attorney Glynn was appointed by the court as guardian of the estate of an incompetent in November 1992. The guardianship estate, valued at approximately $114,000, was intended to help the ward's daughter pay rent and other college expenses. Attorney Glynn often failed to

provide checks timely for those payments. The second matter concerned Attorney Glynn's conduct as guardian of the estate of another incompetent, to which he was appointed in April 1993. The guardianship estate of approximately $100,000 to $125,000 was to make $1200 per month payments for the support of the ward's minor child. The parties in this proceeding stipulated that Attorney Glynn was relatively inexperienced in guardianship matters and that each of these guardianships was relatively simple and had no significant complications.

¶ 6. In those two matters, Attorney Glynn received court-approved fees of $2,750 and $2,000, respectively, for services rendered up to the summer of 1993. Thereafter, he paid himself fees that were not approved by the court for additional services for 1993 through 1995: $31,600 and $40,925, respectively. The referee found that the additional fees Attorney Glynn paid himself in each of those estates were not reasonable.

¶ 7. In each of those estates, Attorney Glynn did not file an inventory and filed only one annual account, covering the period April through December 1993. In one of them, his failure to file annual accounts, despite repeated requests to do so from the Veterans Administration Hospital where the ward resided, led to the ward's temporary loss of VA benefits. Attorney Glynn filed in each of the estates, as part of the annual account he did file, a list of disbursements he had made to himself. In one of them, he filed a petition and proposed order approving fees and expenses, indicating that he had made a number of substantial disbursements to himself for fees, but the court declined to approve any fees at that time.

¶ 8.   Soon after declining to approve his fees, the court asked an attorney with extensive experience in similar matters to look into Attorney Glynn's activities in those two estates and appointed that attorney guardian ad litem for each of the wards on November 14, 1995. After Attorney Glynn resigned as guardian of the estates in mid-February 1996, the investigating attorney reported to the court that there were problems with Attorney Glynn's handling of the estates but no assets were unaccounted for. That attorney also informed the Board of Attorney Glynn's conduct in those matters.

¶ 9.   On February 22, 1996, Attorney Glynn wrote the court about his work in the two estates, stating his intention to give the successor guardian in each a check for all fees he paid to himself without court approval. However, no such checks were forthcoming.

¶ 10.   In early March 1996 Attorney Glynn prepared, dated and signed letters addressed to the successor guardian of the two estates, together with three checks payable to each, ostensibly as reimbursement of the fees he had taken without court approval. However, Attorney Glynn never sent the letters or checks to the successor guardian, and no checks or payment of restitution were ever sent or received. Yet, Attorney Glynn sent copies of the letters and checks to the attorney investigating his conduct. That attorney then believed for a time, albeit wrongly, that Attorney Glynn had made substantial restitution to the two estates.

¶ 11.   At the disciplinary hearing, Attorney Glynn testified that he sent those copies to the investigating attorney, without any cover letter, explanation, or prior arrangement, simply for his review and approval. He insisted that he did not intend to mislead

that attorney. The referee found Attorney Glynn's testimony in that respect not credible.

¶ 12. The investigating attorney informed the court that Attorney Glynn was entitled to some fees for his work in each of the estates and told Attorney Glynn he would have to provide an itemized substantiation of the work he did in each of them. In early 1996 the investigating attorney sought a court order for payment to each of the estates from Attorney Glynn and the company that had provided his bond for excessive attorney fees Attorney Glynn had paid himself. The court orders that issued in July 1996 acknowledged that Attorney Glynn was entitled to reasonable guardian fees for the years in which he served but held him and the bonding insurer jointly liable to the estates in the amounts of $48,367.03 and $38,397.54 plus interest, less a reasonable amount of fees for which Attorney Glynn was to submit a detailed request.

¶ 13. Thereafter, Attorney Glynn provided the investigating attorney two itemized statements purportedly listing the dates on which he had done work connected with each of the estates, the type of work done, and the time spent doing it. The investigating attorney concluded that those statements were not truthful. The referee found that they falsely indicated that Attorney Glynn had spent substantial time on the estates that in fact he had not spent.

¶ 14. The investigating attorney wrote Attorney Glynn that he would not approve a request for attorney fees based on those itemized statements but would not contest a fee of $2500 in each of the two estates. Subsequently, that attorney showed Attorney Glynn some of the evidence supporting his rejection of the itemized statements and invited Attorney Glynn to submit an affidavit addressing the reasonableness, necessity, and

amount of work he claimed to have done. Attorney Glynn said he would prepare such affidavit but never did.

¶ 15. Thereafter, the attorney for the bonding insurer wrote Attorney Glynn that absent complete reimbursement by him of funds it was required to pay, the company would seek to have certain "fraud" language included in the court orders awarding it judgments against him. Shortly before one of the estate matters was to go to hearing, Attorney Glynn sent a letter to the investigating attorney stating that he would not request any compensation in either of the estates and would not object to the entry of the proposed orders. The court then entered final orders in each of the estates for surcharge and judgment against Attorney Glynn and the bonding insurer, including language that the judgments were for "money obtained by false pretenses" or for "fraud or defalcation while acting in a fiduciary capacity or embezzlement or larceny," each as defined under federal criminal statutes.

¶ 16. The third matter considered in this proceeding concerns Attorney Glynn's conduct as court-appointed conservator commencing September 1993. The conservatee, 93 years old and suffering from dementia, initially lived in her own apartment but eventually was placed in a nursing home. This was a relatively simple matter with no significant complications warranting other than a customary charge.

¶ 17. Over a period of two and one-half years, Attorney Glynn paid himself $10,950 out of the conservatorship estate, some of that without court approval. His records of time spent in the matter set forth activity that was unnecessary for the proper performance of his duties. He ultimately repaid the conservatorship $5000 as ordered by the court.

¶ 18.   The first inventory in that conservatorship was due March 22, 1994, but was not filed until January 6, 1995. Attorney Glynn failed to pay nursing home bills timely and did not obtain a bond despite a court order that he do so. Attorney Glynn also failed to file a federal benefits form properly when the conservatee's money was exhausted, and he had problems valuing and cashing savings bonds she owned, causing the conservatorship to have cash flow and federal benefits problems.

¶ 19.   On the basis of those facts, the referee concluded that Attorney Glynn engaged in professional misconduct as follows:

¶ 20.   He charged unreasonable fees in each of the two guardianships and in the conservatorship, in violation of SCR 20:1.5(a).[1] By failing to seek court approval at all times for his fees, by failing to file inventories and

---

[1] SCR 20:1.5 provides, in pertinent part:

**Fees**

(a)   A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1)   the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2)   the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)   the fee customarily charged in the locality for similar legal services;

(4)   the amount involved and the results obtained;

(5)   the time limitations imposed by the client or by the circumstances;

(6)   the nature and length of the professional relationship with the client;

(7)   the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)   whether the fee is fixed or continent.

annual accounts timely, by failing to submit bills timely in support of his fees, and by failing to educate himself regarding guardianship and conservatorship proceedings, he failed to provide competent representation, in violation of SCR 20:1.1,[2] and failed to act with reasonable diligence and promptness in representing clients, in violation of SCR 20:1.3.[3] In one of the guardianship matters, by providing legal services without the necessary experience and by failing to pay rental checks to the ward's daughter timely, he failed to provide competent representation, in violation of SCR 20:1.1. In the conservatorship matter, by failing to pay nursing home bills timely and obtain a bond, by failing to file application for federal benefits properly and value and cash savings bonds properly, and by not taking steps necessary to educate himself concerning conservatorship proceedings, he failed to provide competent representation and act with reasonable diligence and promptness in representing a client, in violation of SCR 20:1.1 and 1.3. By paying himself excessive and unauthorized fees in the two guardianship matters and attempting to justify those payments by false itemized statements and by sending the investigating attorney documents falsely indicating that he was reimbursing the estates for disbursements he

---

[2] SCR 20:1.1 provides:

**Competence**
A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

[3] SCR 20:1.3 provides:

**Diligence**
A lawyer shall act with reasonable diligence and promptness in representing a client.

made to himself without court approval, he engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of SCR 20:8.4(c).[4]

¶ 21.    In addition to the suspension of his license to practice law for six months, the referee recommended that reinstatement of that license be conditioned upon Attorney Glynn's making "satisfactory progress" toward satisfying the judgments obtained by the bonding insurer. Finally, the referee recommended that Attorney Glynn be required to pay the costs of this proceeding.

¶ 22.    The referee explicitly rejected the Board's position, reasserted in its cross-appeal, that the misconduct established in this proceeding warrants a one-year license suspension. The referee stated that he does not believe that Attorney Glynn is "irredeemably dishonest." The referee noted that Attorney Glynn had not been disciplined previously, that three circuit court judges testified to his "excellent reputation for truthfulness and honesty," and that he cooperated in the disciplinary proceeding. At the same time, while noting that Attorney Glynn acknowledged the wrongful nature "of at least some of his conduct," the referee emphasized that he "reaped substantial financial benefits from the modest Estates of persons effectively unable to protect themselves, while performing no services of commensurate value, and. . .was not completely honest and consistently truthful." He expressly rejected Attorney Glynn's contention that his

---

[4] SCR 20:8.4 provides, in pertinent part:

**Misconduct**

It is professional misconduct for a lawyer to:

. . .

(c)   engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

misconduct was the result of his youth and inexperience. The referee determined that a six-month license suspension was required in order that Attorney Glynn not be able to return to the practice of law without this court's approval.

¶ 23. In his appeal, Attorney Glynn presented no meritorious argument for his contention that the referee erred in concluding that he engaged in dishonest conduct by preparing, dating, and signing letters and checks purporting to repay two guardianship estates but never sending them to the successor guardian, using copies of them instead to mislead the investigating attorney appointed by the probate court into believing that he had made restitution. Also without merit is his argument that a public reprimand is sufficient discipline for his professional misconduct, based on his lack of prior discipline, the testimony of three judges in respect to his reputation for truthfulness and honesty, his cooperation with the Board in its investigation, and his acknowledgment of the wrongful nature of his conduct. In respect to the latter, he ignored the referee's finding that his insistence that his sending of a letter and checks purporting to show he made restitution was not intended to be deceptive and that his itemized statements of services were truthful and substantially accurate "suggest[s] that he has not come to grips completely with his wrongdoing."

¶ 24. Attorney Glynn's reliance on prior disciplinary cases to support his contention that a public reprimand is sufficient is misplaced. While in each of the cases he cited that resulted in a license suspension of 90 days or more the attorney failed to cooperate in the Board's investigation, had prior discipline, or both, none of those cases dealt with professional misconduct similar to his. His argument in that respect totally

ignores the seriousness of his misconduct and the harm, actual or potential, that it caused.

¶ 25. We adopt the referee's findings of fact and conclusions of law and determine that the seriousness of Attorney Glynn's misconduct warrants the suspension of his license to practice law for one year. Over a period of approximately two and one-half years, he paid himself $31,600 as guardian of a ward's estate valued at approximately $114,000, after already having been paid a court-approved $2750, and paid himself without court approval almost $41,000 from another ward's estate valued at approximately $125,000, after having been paid a court-approved $2900. He also took almost $11,000, some of it without court approval, for services he acknowledged had been based on inaccurate time records that reflected excessive hours for unnecessary services. Moreover, he created documents purporting to show a court-appointed investigator that he had made restitution to the successor guardian of two wards. The large sums taken by Attorney Glynn from vulnerable victims and the purposeful pattern of deception he employed require a meaningful disciplinary response not only as a measure of the seriousness of that misconduct but also to protect the legal system and the public from similar misconduct by Attorney Glynn or any other attorney who might engage in similar misconduct.

¶ 26. In addition to the license suspension, we require that Attorney Glynn make restitution to the clients and the bonding company for the harm his professional misconduct caused them. His license to practice law will not be reinstated until he has made that restitution.

¶ 27. IT IS ORDERED that the license of Charles Glynn to practice law in Wisconsin is suspended for one year, effective June 14, 1999.

¶ 28. IT IS FURTHER ORDERED that as a condition of the reinstatement of his license, Charles Glynn make restitution to those harmed by his professional misconduct established in this proceeding.

¶ 29. IT IS FURTHER ORDERED that within 60 days of the date of this order, Charles Glynn pay to the Board of Attorneys Professional Responsibility the costs of this proceeding, provided that if the costs are not paid within the time specified and absent a showing to this court of his inability to pay the costs within that time, the license of Charles Glynn to practice law in Wisconsin shall remain suspended until further order of the court.

¶ 30. IT IS FURTHER ORDERED that Charles Glynn comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

¶ 31. WILLIAM A. BABLITCH and DAVID T PROSSER, JR., JJ., did not participate.